UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KFORCE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4: 14 CV 1880 CDP |
| | ) | |
| BEACON HILL STAFFING GROUP | ) | |
| LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Kforce and Beacon Hill are competitors in the staffing agency business.

Gary Hahn was an account manager at Kforce until he went to work for Beacon

Hill.  When he joined Kforce, Hahn signed an employment agreement which

contained non-disclosure and non-solicitation provisions.  Kforce complains that

Hahn has violated these provisions by stealing its confidential client information

and soliciting Kforce clients while at Beacon Hill, and it seeks preliminary

injunctive relief against both Hahn and Beacon Hill.  After a hearing on November

13, 2014, I denied Kforce's request for a temporary restraining order and ordered

limited and expedited discovery on Kforce's motion for preliminary injunction.  I

held a hearing on the motion on December 18, 2014, during which both sides

presented evidence by live testimony[1] and exhibits, argued the motion, and

submitted written briefs as instructed by the Court. After due consideration of all

the evidence, I must deny preliminary injunctive relief for the reasons that follow.

## Background Facts[2]

Kforce and Beacon Hill are staffing agencies engaged in the business of

placing personnel ("candidates") with companies seeking to fill job openings

("clients"). Kforce is a large, publicly traded staffing firm with 62 offices across

the United States and 40 to 50 full time employees in its St. Louis office. Beacon

Hill is a smaller firm with a recently opened office in St. Louis. It currently

employs five people in St. Louis, including Hahn. This case involves placement

for information technology positions. Staffing agencies identify prospective

customers, access available job openings, and find candidates for the job openings.

Their revenue is derived from successfully placing candidates at clients. Most

staffing agencies operate similarly, with a recruiting side to recruit candidates and

---

[1] Kforce presented the testimony of three witnesses: defendant Gary Hahn; its managing director on the technical side, Bonita Daughaday; and Pat Burgess, Beacon Hill's division manager. Beacon Hill also called Hahn and two of his former co-workers, Ryan Harris and Adam Riggs, to testify.

[2] Any facts found in this Memorandum and Order are for deciding the preliminary injunction motion only, and this Memorandum and Order does not relieve any party of the burden of proving any facts in support of its claims or defenses on summary judgment or at trial and may not be relied upon for that purpose.

a sales side to deal with clients and find job openings. Account managers like Hahn work the sales side of the business.

The staffing industry is highly competitive, and there is substantial customer and client overlap within the industry. Companies often request multiple staffing agencies to assist in filling the same job opening.[3] Stated otherwise, this means that the same company could be a client of both Kforce and Beacon Hill. For example, Beacon Hill's division manager Pat Burgess testified that about 50 staffing firms place candidates at Express Scripts, and about 20 staffing firms place candidates at Charter, one of the top employers of contract employees in the area.[4] To do business with Charter a staffing agency apparently must first be vetted by a third-party vendor called Zero Chaos. Once a staffing agency gets approved by Zero Chaos and an agreement is put in place, it may then compete with other approved staffing agencies to place candidates at Charter. Based on the testimony it appears that this type of arrangement is common with many companies using staffing agencies, such as Magellan Health Services, Inc.[5]

---

[3] Evidence of this was submitted at the hearing. Defendants' Exhibit H is an email sent from Jim Keller, a program manager at Charter, to numerous people at multiple staffing agencies – including Hahn and two Kforce employees – seeking to hire an information technology contractor.

[4] Hahn estimated that Charter has over 100 hiring managers for information technology services in over 25 hiring groups and about 400-500 information technology contractors placed by staffing agencies at any given time.

[5] It appears that staffing agencies may also be able to place candidates at Charter if they have a master services agreement in place, which is apparently different than Zero Chaos. (Pl.'s Exh.

Account managers find job vacancies in various ways. Sometimes, companies post their job openings on their websites and on public job-posting websites such as Careerbuilder, LinkedIn, Monster.com, Dice.com, or Craigslist. Account managers use this publicly available information as a common tool for locating potential clients. Account managers also call companies requesting hiring information and make cold sales calls on the hiring managers. They may also rely on candidates that they have successfully placed on a job to notify them of new job openings. Account managers may also receive emails or phone calls from companies about job openings. Sometimes these emails are sent to numerous staffing agencies, and sometimes they are sent to a particular account manager. Occasionally, a company may send notice of a job opening to an account manager and claim that it is an "exclusive" posting, but there is no way to verify the accuracy of that statement.[6] Usually, however, the job postings are public and posted online.

At the hearing, the parties differed on their positions as to the relative importance of an account manager's personal relationships with the client's hiring

40). However, the parties did not explain this at the hearing, and so the Court will not consider this fact in its reasoning.

[6] At the TRO hearing, Kforce also explained that sometimes account managers received "first calls" about job postings from clients, which is basically advance notice of a soon-to-be announced job posting. However, there was no evidence of this presented at the preliminary injunction hearing, and Kforce seems to have abandoned any request for relief based on allegations of first calls.

managers.  According to Kforce, it has invested considerable time and expense in developing and maintaining relationships on the client side of the business.  Kforce claims that its account managers have extensive and repeated contacts with its clients, and that they are "responsible for facilitating activities associated with matching candidates to client job openings."  Kforce contends that it compiles "confidential" client information to assist its account managers, and this information "includes such things as confidential communications among management personnel, valuable compilations and information regarding clients and prospective clients (including client contact information, client preferences and needs, and client rates), compilations of employment candidates and prospective employment candidates, Kforce's financial and budgetary information, and information related to marketing strategy."  In support of a preliminary injunction, Kforce argues that "an extremely valuable segment of [its] confidential information is the information . . . regarding the identity of Kforce's clients and candidates, the purchase activity of Kforce's clients, pricing information, compensation information, key contact information and personnel, and other proprietary, customer-specific information regarding Kforce's clients and candidates."  To protect this information, Kforce restricts access to only certain employees with authorized log-ins and passwords.

According to Hahn and Beacon Hill, an account manager's personal relationships are secondary to the primary goal of placing candidates with clients. Defendants maintain that the information used by account managers to do this is not confidential, but is publicly available and can easily be found on the internet.

Before joining Kforce, Hahn worked at another staffing firm called Signature Consultants with Bonita Daughaday. Daughaday is the current managing director of Kforce's technical division. She testified at the hearing. When Daughaday left Signature for Kforce, she solicited Hahn to work for Kforce. According to Hahn, Daughaday told him "not to worry" about the non-compete and non-solicitation agreement he had signed with Signature because it was "not enforceable." Daughaday denied this. She also hired two other Signature employees, Ryan Harris and Adam Riggs, to work for Kforce. They had the same restrictive covenants as Hahn. Both Harris and Riggs testified at the hearing. Riggs claimed that Daughaday also told him not to worry about his restrictive covenants with Signature.

On September 17, 2012, Hahn began working for Kforce. His employment agreement is signed and dated the same day. The agreement contains the following non-disclosure provisions:

> **6. Confidential Information**. The EMPLOYEE recognizes and
> acknowledges that the FIRM has, through the expenditure of
> substantial time, effort and money, developed, compiled, and/or
> acquired certain confidential information and trade secrets which are

of great value to the FIRM in its operations. The EMPLOYEE further acknowledges and understands that in the course of performing his/her duties for the FIRM, he/she will receive and/or have access to the trade secrets and other confidential information of the FIRM.

The EMPLOYEE agrees that he/she will not make any use of, take, download, publish or disclose, or authorize anyone to use, take, publish or disclose, any of the FIRM's trade secrets or other confidential information, for any reason, except to the extent authorized and required in the course of performing his/her duties on behalf of the FIRM. Upon request of the FIRM, the EMPLOYEE will promptly return or destroy all expressions of trade secrets and confidential information in his/her possession and control. EMPLOYEE shall cooperate with the FIRM's efforts to verify such return or destruction.

As used herein, the term "trade secrets and other confidential information" shall include, without limitation: (a) client or prospective client lists and client or prospective client contact information (including but not limited to business cards, contact persons, and hiring managers); (b) client job openings and job orders and client pricing information; (c) actual or prospective applicant, employment candidate, employee or consultant lists; (d) actual or prospective applicant, employment candidate, employee or consultant qualifications, contact information, and resumes; (e) actual or prospective applicant, employment candidate, employee or consultant compensation and benefits; and (f) other client, applicant, employment candidate, employee or consultant data or information.

Hahn's Kforce employment agreement also contains the following non-solicitation

covenant:

a) <u>Covenants relating to clients</u>: the EMPLOYEE agrees that upon termination of his/her employment for any reason, the EMPLOYEE will not, for a period of twelve (12) months from the date of termination, directly or indirectly solicit or accept business that is competitive with the FIRM from any client with whom the EMPLOYEE had contact while employed by the FIRM, nor will the EMPLOYEE for such period directly or indirectly attempt to

> divert or assist others to divert any such client's business from the
> FIRM to a competitor.

Hahn testified that he did not read his employment agreement before signing it.

Hahn described his job at Kforce as mainly identifying potential customers from public sources such as company and industry websites, social media, and cold calls. Hahn would then contact the person within the customer company responsible for hiring. Hahn stated that the name of the hiring person at any customer company is not confidential and is obtainable simply by calling the company and asking to speak to the person in charge of hiring. If Hahn was successful, the company would send him an order to fill a job opening with a description of the candidate's required qualifications. Hahn was also given specific clients or accounts to work, which included Charter, Magellan, Brown Shoe Company, Inc., Graybar Electric Company, Inc., Enterprise Rent-a-Car Company, Sigma Aldrich Corporation, City of St. Charles, Saint Louis University, and Olin Brass. Hahn testified that he had worked with Charter before he joined Kforce, and that he also knew Mike Carlock, a hiring manager at Magellan, before working at Kforce.

Kforce claims that, while he was employed there, Hahn developed relationships with key hiring managers at Magellan, including Jay Pendergraft and Diane Wintermann, and Charter managers Ben Marti, Jim Hollman, Dwayne Thomas, Jim Keller, Christina Elliot, Teresa Rehm, Randy Rush, and Lamarr

Gordon. Hahn developed these relationships through emails, phone calls, on-site visits, lunches, and other social outings. Kforce claims that Hahn's efforts gave it "a better understanding of the teams within Charter and Magellan and the individuals who made up these teams" which allowed it "to understand the different phases of the software development and other IT projects on which Charter and Magellan were working and the duration of the different phases which, in turn, allowed Kforce to instruct its employees on how to better recruit" for these companies. There is a dispute in the evidence as to whether Hahn's efforts resulted in increased placements at Charter by Kforce. Kforce said that they did, but Doughaday admitted that Kforce's Charter placements increased after Hahn left. Hahn claims that he had only "a few" placements with Charter during his employment with Kforce, and none were through his contact with Jim Keller.

Hahn claims he was unhappy at Kforce because he did not get the support he needed to service his customers and because Kforce kept lowering his salary. Kforce maintains that the salary reductions were in accordance with the compensation provisions of Hahn's employment agreement. In March of 2014, Hahn was recruited for another staffing agency, and in April of 2014 he accepted a job with Beacon Hill. His last day was April 11, 2014.

Prior to his departure, Hahn emailed Kforce documents, including client target lists and organizational charts, to his home account.[7] Hahn claimed he needed this information because he was working from home. Kforce claims these documents contain confidential information. They were introduced at the hearing as Plaintiff's Exhibits 10 and 11. Kforce also complains that Hahn solicited its clients before his departure. Attached to its complaint as evidence of this alleged solicitation is an email exchange between Hahn and Jim Keller, a program manager for Charter, informing him that he is leaving Kforce and inviting him to meet his replacement at Kforce, Kristen Roach. The initial email was also copied to Roach. In the email exchange, Hahn goes on to invite Keller to play in a golf tournament sponsored by Beacon Hill. On April 10, 2014, Hahn emailed Diane Wintermann at Magellan Health Services to inform her of his last day and that Roach was to be his replacement. Again, this email was also copied to Roach. In a later email not copied to Roach, Hahn informs Wintermann that he is moving to Beacon Hill and "will make sure to send you my contact information when I get settled." While still employed at Kforce, Hahn also forwarded to his home email account and to Burgess, his soon-to-be boss at Beacon Hill, a job posting for the City of St. Charles that he obtained as a Kforce account manager. Hahn tells

---

[7] Although I denied Kforce's request for a temporary restraining order, I ordered Hahn to return these documents to Kforce, which he did.

Burgess that it is an immediate hire and provides him with the profiles of potential candidates to fill the position. (Pl.'s Exhs. 18 and 19).

Hahn began working for Beacon Hill as an account manager on April 14, 2014. Hahn signed an employment agreement – which he also claims he did not read – with Beacon Hill which contains similar confidentiality provisions to the one at issue. The Beacon Hill agreement also contains a non-compete provision more restrictive in nature than the non-solicitation provision in the Kforce agreement. (Pl.'s Exh. 23). Beacon Hill's largest accounts are Express Scripts, Unisys, Maritz, and Charter. Hahn primarily works the Charter and Magellan accounts. During his first few days at Beacon Hill, Hahn emailed his new contact information to hiring managers at Charter and Magellan, invited some to a Beacon Hill golf tournament, and asked Carlock to lunch. (Pl.'s Exhs. 24 and 27). Hahn also emailed Burgess and others at Beacon Hill about "strategies to win Charter" and Keller's hiring preferences. (Pl.'s Exh. 25). Burgess testified that Charter was a "target" for Beacon Hill and that it had a request for proposal from Charter before Hahn started. However, Beacon Hill did not complete the necessary paperwork in order to do business with Charter until July 9, 2014, and it had no placements with Charter before Hahn arrived. Burgess credited Hahn with getting Charter as a client. (Pl.'s Exh. 40). Since Hahn arrived, Beacon Hill has placed four candidates with Charter, with a fifth placement pending. Burgess claimed to

be familiar with Magellan from his work at another staffing agency, but Beacon Hill had placed no candidates at Magellan before Hahn's arrival. After Hahn started, Beacon Hill placed one candidate at Magellan for three days. Beacon Hill has also placed one candidate with the City of St. Charles. Burgess testified that Hahn's placements at Charter have generated about $40,000.00 in revenue for Beacon Hill, and that Magellan has cost it money. Burgess testified that he rates Hahn's performance a "C." Burgess also testified that Hahn never showed him Kforce's organizational charts, but that type of information was available on a subscription website called discover.org, of which Beacon Hill is a member.

Kforce alleges that it had no notice of Hahn's solicitation of its clients until he was spotted having lunch with Charter hiring manager Gordon in late August of this year. Doughaday testified that Hahn actively concealed his activities by telling her that he was not servicing the same clients he serviced at Kforce. Kforce first searched Hahn's email account for suspicious activities on September 10, 2014, when it discovered the emails he forwarded to his personal account. Kforce's attorneys sent a letter to Beacon Hill on September 24, 2014, informing it of Hahn's non-disclosure and non-solicitation agreements and his alleged breach of those covenants. Kforce's attorneys sent a similar letter to Hahn on September 29, 2014, claiming that Kforce only "recently learned" that Hahn went to work for Beacon Hill. On October 14, 2014, Keller sent a job proposal for Charter to

Hahn's old Kforce email address instead of his new Beacon Hill email address. Kforce filed its complaint against Hahn and Beacon Hill on November 6, 2014, alleging breach of contract, tortious interference with contract, breach of fiduciary duty, and misappropriation of trade secrets. Kforce seeks injunctive and monetary relief.

## Preliminary Injunction Standard

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kansas City So. Trans. Co., Inc. v. Teamsters Local Union # 41,* 126 F.3d 1059, 1066 (8th Cir. 1997) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). In the Eighth Circuit, these four factors are known as the " *Dataphase* " factors, based upon the 1981 en banc case, *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting injunctive relief bears the "complete burden" of proving that an injunction should be granted.

*Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## Discussion

At the preliminary injunction stage, Kforce must establish a substantial likelihood of prevailing on the merits of its claims. *Planned Parenthood Minn.v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Kforce brings Missouri state law claims for breach of contract, tortious interference with contractual or business relationships, breach of fiduciary duty and/or the duty of loyalty, and misappropriation of trade secrets against Hahn. Kforce also alleges tortious interference and misappropriation of trade secrets claims against Beacon Hill. To prevail on a breach of contract claim under Missouri law, a plaintiff must demonstrate (1) the existence and terms of a contract; (2) that the plaintiff performed or tendered performance of the contract; (3) a breach of the contract by defendant; and (4) resulting damages. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). "Much has been written about an employee's covenant against working for his employer's competitors. Agreements of this kind restrain commerce and limit the employee's freedom to pursue his or her trade. Enforcement of such agreements, therefore, is carefully restricted." *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 73-74 (Mo. banc 1985). The Missouri Supreme

Court has identified the following four "valid and conflicting concerns" at issue in

the enforcement of non-compete agreements:

> First, the employer needs to be able to engage a highly trained
> workforce to be competitive and profitable, without fear that the
> employee will use the employer's business secrets against it or steal
> the employer's customers after leaving employment. Second, the
> employee must be mobile in order to provide for his or her family and
> to advance his or her career in an ever-changing marketplace. This
> mobility is dependent upon the ability of the employee to take his or
> her increasing skills and put them to work from one employer to the
> next. Third, the law favors the freedom of parties to value their
> respective interests in negotiated contracts. And fourth, contracts in
> restraint of trade are unlawful.

*Healthcare Services of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 609 -

610 (Mo. banc 2006) (internal citations omitted). In Missouri, restrictive

covenants are enforceable only to the extent that they are demonstratively

reasonable by protecting an employer from unfair competition without imposing

unreasonable restraint on the former employee. *Armstrong v. Cape Girardeau

Physician Associates*, 49 S.W.3d 821, 825 (Mo. Ct. App. 2001). "An employer

may only seek to protect certain narrowly defined and well-recognized interests,

namely its trade secrets and its stock in customers." *Id.* "The enforcing party must

also show that the agreement is reasonable in scope, both as to place and as to

time." *Id.* "The burden of demonstrating the covenant's validity is on the party

seeking to enforce it." *Id.*

Under the Missouri Uniform Trade Secrets Act (which forms the basis of

Kforce's misappropriation of trade secrets claim against Hahn and Beacon Hill), a

"trade secret" consists of:

> information, including but not limited to, technical or nontechnical
> data, a formula, pattern, compilation, program, device, method,
> technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not
> being generally known to, and not being readily ascertainable by
> proper means by other persons who can obtain economic value form
> its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

*Mo. Rev. Stat.* § 417.453 (2000). *See also*, *Lyn-Flex West, Inc. v. Dieckhaus,* 24

S.W.3d 693, 697-698 (Mo. Ct. App. 1999) (A "trade secret," according to Missouri

law, is information -- including but not limited to -- technical or nontechnical data,

a formula, pattern, compilation, program, device, method, technique, or process

that derives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable by proper means by other

persons who can obtain economic value from its disclosure or use).  Furthermore,

in order to be considered a trade secret, the information must be the subject of

efforts that are reasonable under the circumstances to maintain its secrecy.

*Conseco Finance Servicing Corp. v. North American Mortgage Co.* 381 F.3d 811,

819 (8th Cir. 2004).  The following factors should be considered in determining

whether an employer's given information is a trade secret:

> (1) the extent to which the information is known outside of his
> business; (2) the extent to which it is known by employees and others
> involved in his business; (3) the extent of measures taken by him to
> guard the secrecy of the information; (4) the value of the information
> to him and to his competitors; (5) the amount of effort or money
> expended by him in developing the information; (6) the ease or
> difficulty with which the information could be properly acquired or
> duplicated by others.

*Copeland,* 198 S.W.3d at 610 (internal citations omitted).

The employer bears the burden of proof to substantiate its asserted interest in

its trade secrets.  *Mo-Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396,

400 (Mo. Ct. App. 1984).  Evidence of purported "trade secrets" must be more

than general assertions, but must be sufficiently specific to allow a determination

by the court. *Copeland,* 198 S.W.3d at 610.  *See also*, *Baxter Intern., Inc. v.*

*Morris,* 976 F.2d 1189, 1194 (8th Cir. 1992) ("The burden of proving the existence

of trade secrets lies with the party seeking protection.").  Additionally, "[u]nder

Missouri law, the restraint imposed on a former employee to protect trade secrets

must not be greater than required for the protection of the former employer." *Id.*

While a former employer is not required to await actual harm before seeking relief,

injunctive relief "must be based on a real apprehension that future acts are not just

threatened but in all probability will be committed." *Id.* (internal quotation marks

and citation omitted).

While employed with Kforce, Hahn owed a duty of loyalty to Kforce. Under *Nat'l Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 41 (Mo. banc 1966), every employee owes his or her employer a duty of loyalty. *Id.; see also* Rest. (2d) Agency, sec. 387 (1958). The Missouri Supreme Court has described the duty of loyalty in the broad and general terms of section 387 of the Restatement (2d) of Agency, stating, "[an employee] must not, while employed, act contrary to the employer's interests." *Trieman,* 409 S.W.2d at 41; *Scanwell Freight Express STL, Inc. v. Chan,* 162 S.W.3d 477, 479 (Mo. banc 2005). *See also*, *Synergetics, Inc. v. Hurst,* 477 F.3d 949, 959 (8th Cir. 2007) ("A breach of the duty of loyalty arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which, by definition, is to gain advantage over a competitor.") (internal quotation marks and citation omitted). Although permitted to make arrangements to compete with an employer prior to termination of employment, an employee may not use confidential information peculiar to or acquired from his employer, nor may the employee solicit customers for his rival company. *See Chan,* 162 S.W.3d at 481 (*citing* Restatement (Second) of Agency, § 393 cmt. e (1958)).

"Under Missouri law, intentional interference with a contract or business relationship requires proof of (1) a contract or valid business expectancy, (2) defendant's knowledge of the contract or relationship, (3) a breach induced or

caused by defendant's intentional interference, (4) absence of justification, and (5) damages." *Hurst*, 477 F.3d at 959 (*citing Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo. banc 1996)). "While lawful competition would be a defense, competing by improper means, including the use of a misappropriated trade secret obtained in violation of a fiduciary duty is not a valid justification." *Dieckhaus,* 24 S.W.3d at 700 (*citing Briner Elec. Co. v. Sachs Elec. Co.,* 680 S.W.2d 737, 741 (Mo. Ct. App. 1984)).

Whether Kforce may enforce its restrictive covenants under Missouri law, whether it has any protectable trade secrets, and whether it may restrict Hahn and/or Beacon Hill from soliciting clients of Kforce are complex and hotly contested factual disputes, and at this juncture the Court is unable to say that either side is likely to prevail at trial. To the extent credibility is a factor, I did not find any of the witnesses particularly credible.

On the breach of contract, tortious interference, and misappropriation of trade secrets claims, Hahn and Beacon Hill have presented evidence that the information Hahn allegedly misappropriated is not protectable because it is widely available to the public, known by account managers generally in the staffing agency business, and easily ascertainable by other sources. Hahn testified that the names of hiring managers are generally available to the public, either through websites or by calling companies. Although Burgess did not see plaintiff's

19

Exhibits 10 and 11 – the Kforce documents emailed by Hahn to his home email account – he testified that the type of information they contain (the names of hiring managers, company structure, and hiring needs) is readily available publicly and through a subscription website used by staffing agencies, including Beacon Hill. After reviewing plaintiff's Exhibits 10 and 11, the Court finds defendants' characterization of this information more credible at this time than Kforce's, as the information contained within does not appear the type protected as confidential trade secrets. Kforce may not rely on the non-compete agreement itself to establish the secrecy of the information. "In order for a non-compete agreement to preclude disclosure of trade secrets, those secrets must exist; they do not exist by virtue of the agreement itself." *Tank Tech, Inc. v. Neal*, 2007 WL 2137817, *7 (E. D. Mo. July 23, 2007). To the extent Hahn's mental impressions of certain hiring managers are included in these documents, that is not the type of information Kforce may prevent Hahn from using. *See Victoria's Secret Stores, Inc. v. May Dept. Stores Co.*, 157 S.W.3d 256, 262 (Mo. Ct. App. 2005) ("The protection [of covenants not to compete] does not extend to knowledge that is the natural product of the employment or known throughout the industry, but only to trade secrets or influences over customers.").

As for Kforce's argument that it is entitled to protect its customer contacts, "the rationale for protecting customer contacts is that in the sales industry, a

customer's goodwill toward a company is often attached to the employer's individual sales representative, and the employer's product or service becomes associated in the customer's mind with that representative." *Brown v. Rollett Bros. Trucking Co., Inc.*, 291 S.W.3d 766, 774 (Mo. Ct. App. 2009) (internal quotation marks and citation omitted). "An employer must show that the employee had contacts of the kind enabling him to influence customers." *Id.* at 775. Here, however, there is evidence that it is not the account manager's relationship with the client's hiring managers, but the staffing agency's ability to successfully deliver candidates, which leads to increased placements. While Kforce presented evidence that Hahn had contact with the hiring managers of Charter, Magellan, and others, it did not present any evidence that this contact actually led to any placements for Kforce. Hahn testified that he had few placements at Charter, and Daughaday admitted that Kforce's placements at Charter increased after Hahn left. Stated otherwise, there is no evidence that Hahn had any opportunity for actually influencing hiring managers to select a Kforce candidate over a competing agency's candidate. Instead, the evidence showed that the job postings were often publicly available or emailed to account managers at multiple staffing agencies at the same time. For example, defendants' Exhibit H is an email sent from Keller at Charter to numerous people at multiple staffing agencies, including Hahn at Beacon Hill and two Kforce employees, seeking to hire an IT contractor. On this

record, there is no evidence that Hahn's contact with customers was such that it enabled Hahn to entice a client's business away from Kforce in favor of Beacon Hill. Rather, the evidence at this point suggests that in this industry the decision as to which staffing agency gets the placement fee is dependent upon the staffing agency's ability to produce the candidate selected for placement – an area in which Hahn was admittedly not involved – and not the account manager who received the job posting. Moreover, many of the clients of Kforce – including Charter – are just as easily considered to be clients of Beacon Hill. For example, Burgess testified that about 20 staffing firms place candidates at Charter, which has over 100 hiring managers for information technology services in over 25 hiring groups with about 400-500 IT contractors at any given time. Neither Kforce nor Beacon Hill has exclusive or guaranteed contracts for placement at Charter. Given the competitive realities of this industry, the Court cannot conclude at this time that Hahn and Beacon Hill should be precluded from competing for placements at Charter along with Kforce and other staffing agencies. The same is true of Magellan and the other clients mentioned by Kforce.

Kforce's likelihood of success is stronger on its breach of duty claim, given Hahn's admission that he forwarded a job posting he received at Kforce to Beacon Hill while still employed at Kforce. At this time, though, the evidence on this claim appears to be limited in scope to this isolated incident. However, I need not

resolve the complex issue of whether Kforce is likely to succeed on the merits of its claims as I find that the motion must be denied because Kforce has not demonstrated that it is likely to suffer irreparable injury in the absence of injunctive relief.

"The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir. 1989) (en banc). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction . . . ." *Id.* Irreparable harm must be certain and imminent such that there is a clear and present need for equitable relief. *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995). When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys.*, 871 F.2d at 738.

Here, Kforce's claims irreparable harm are undercut by the fact that any potential sales wrongfully diverted from Kforce to Beacon Hill through Hahn's efforts can be quantified and therefore compensated in the form of money damages. For example, if the City of St. Charles placement by Beacon Hill is shown to be the result of Hahn sending the job posting to Beacon Hill while still

employed at Kforce, the lost commission can be calculated and awarded to Kforce as damages for Hahn's breach of duty of loyalty. The same is true of any other placements that are shown to be the result of Hahn's improper use of confidential information or breach of any enforceable covenants. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009). Here, Kforce has presented nothing more than the possibility of harm resulting from Hahn and Beacon Hill's activities. Mere speculative harm is an insufficient basis upon which to grant injunctive relief, particularly where the alleged damages are capable of ascertainment. As Kforce can be fully compensated for any alleged loss through an award of money damages, injunctive relief must be denied.

When the lack of irreparable harm is considered in conjunction with the remaining *Dataphase* factors, I do not find that the balance of equities favors injunctive relief. Kforce has no exclusive placement contract with Charter or Magellan or any of the other clients discussed at the preliminary injunction hearing. It merely has the same right to compete for placements as Beacon Hill. To enjoin not only Hahn but also Beacon Hill from soliciting clients serviced equally by Kforce and Beacon Hill would inequitably stymie competition and award Kforce a windfall it would not otherwise enjoy in this market. Both parties

discussed "unclean hands" at length during the preliminary injunction hearing. Although I am not finding at this time that any party acted inequitably, I simply note that all witnesses who testified were very familiar with the way this industry works and some may have used that knowledge to their benefit irrespective of what their contractual obligations may have actually required of them. At the very least, this knowledge should have prompted Kforce to investigate Hahn's activities and act on any alleged improprieties in a more a timely fashion.[8] The potential harm to Hahn if an injunction were granted outweighs the potential harm to Kforce if injunctive relief is denied, as an injunction prohibiting Hahn from working his two major accounts (Charter and Magellan) would effectively preclude him from working for Beacon Hill. To the extent the public interest is considered, this factor is neutral, as public policy favors the enforcement of contracts but also frowns upon restraints against trade. For all these reasons, injunctive relief is not warranted.[9]

---

[8] For this reason, even if I had granted injunctive relief I would not have extended it for a year from the date of the injunction as requested by Kforce.

[9] Again, I stress that these findings are preliminary in nature and made solely for purposes of deciding the pending motion and should in no way be construed as either an endorsement of defendants' activities or a condemnation of plaintiff's case.

Finally, the Court believes that this is a case ripe for early referral to mediation. This is a case that should be settled, so the Court expects all counsel and parties to use their best efforts and work cooperatively to do just that.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for preliminary injunction [#23] is denied.

This case will be referred to mediation by separate Order.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 8th day of January, 2015.